1998 SD 85

**In the Matter of the ESTATE OF Oliver Paul PERRY, Deceased.**

**No. 20139.**

Supreme Court of South Dakota.

Argued March 24, 1998.

Decided July 29, 1998.

---

Dennis Duncan of Zimmer, Duncan & Cole, Parker, for Dorris Gleaton.

Thomas J. Johnson, Sioux Falls, for Bonita B. Sills and Gary P. Brown.

AMUNDSON, Justice.

[¶ 1.] After husband's death, guardians for the estate of wife, who is an incompetent, challenged the validity of asset transfers purportedly made according to three separate powers of attorney, among other issues. The trial court ruled that wife was incompetent at the time of the execution of the powers. Therefore, the court held the transfers made pursuant to those instruments and challenged by the guardians were invalid. The personal representative of husband's estate appeals. We affirm in part and reverse in part.

## FACTS

[¶ 2.] Oliver Paul Perry and Dorothy Perry were married from 1975 until Oliver's death on October 25, 1995. It was the third marriage for both Oliver and Dorothy. There were no children born of this marriage, but the parties did have children from their prior marriages. Oliver's first marriage produced his only child, Dorris Gleaton. Dorothy also had one child, Gary Brown.

[¶ 3.] Dorothy pursued a career at Southwestern Bell Telephone Company beginning before her marriage to Oliver and ending with her retirement in 1982. Oliver worked in the oil field business until his retirement in 1980. Oliver also continued to work as a handyman after his retirement.

[¶ 4.] In May of 1992, Dorothy became ill and was hospitalized, suffering from viral encephalitis.[1] She was hospitalized until June 2, 1992, and then returned to the marital home in Granbury, Texas.

[¶ 5.] In December of 1992, Oliver and Dorothy consulted an attorney and made plans to transfer certain assets in contemplation of Dorothy entering a nursing home. Gleaton contended that Oliver and Dorothy outlined their plan to her to distribute some of Dorothy's property to Dorothy's family members. As part of this plan, Dorothy executed a power of attorney dated December 21, 1992,[2] which purported to give Oliver the power to transfer certain assets, all of which were specifically referred to in the instrument. Gleaton contends that Dorothy directed Oliver to transfer certain savings bonds to Dorothy's family members that were mentioned in the instrument granting a power of attorney. These bonds were held jointly in Dorothy's name and in the name of Dorothy's family members. A number of other assets were also transferred to Dorothy's family members under the first power of attorney, including a rental residence in Graham, Texas, and certificates of deposit. Other asset transfers were made pursuant to the power of attorney, including the sale of Dorothy's "Baby Bell" stock portfolio to

---

1. This condition involves an inflammation of the brain.

2. A lawyer in Texas prepared this power of attorney, but he did not testify in this matter and was never identified.

Gleaton. Gleaton contends that she paid $17,000 in cash for this stock.

[¶ 6.] In February of 1993, Oliver and Dorothy left Granbury, Texas, and came to Parker, South Dakota. Dorothy became a resident at the nursing home in Parker owned and operated by Oliver's grandson, Michael "Mick" Turner.

[¶ 7.] After Dorothy's move to Parker, Oliver sold their residence in Granbury, utilizing a May 13, 1993, durable power of attorney to dispose of Dorothy's interest in the jointly held property. It appears from the record that this new durable power of attorney was created because a previous one [3] was objected to by the bank or title company on the basis that the prior power of attorney lacked specific sale authority over Dorothy's real estate.

[¶ 8.] After the sale of the Granbury home, Oliver purchased a home in Parker in his name only. He continued to reside there until his death on October 25, 1995.

[¶ 9.] On November 22, 1995, Gleaton, the executor named in Oliver's will, applied for informal probate and for appointment of a personal representative. Gleaton, herself, was then appointed personal representative of Oliver's estate.

[¶ 10.] On March 14, 1996, Bonita Sills (Dorothy's sister), and Gary Brown, guardians for the estate of Dorothy (collectively referred to as Guardians), filed a petition with the circuit court. They made requests for a supervised administration of Oliver's estate, for the removal of Gleaton as Oliver's personal representative, for an elective share out of Oliver's estate for Dorothy, and for the return of assets that had been converted from Dorothy's ownership under the contested power of attorneys. On March 21, 1996, Guardians petitioned the circuit court for a restraining order, claiming, among other things, that the December 21, 1992, power of attorney granted by Dorothy to Oliver was invalid. A stipulated restraining order was filed on April 3, 1996. Finally, on May 9, 1996, Guardians brought additional motions requesting reimbursement from the estate for a family allowance, continuing support through a family allowance, a transfer of the homestead, a transfer of certain personal property, and to require delivery of certain certificate of deposit funds. Gleaton opposed the Guardians' motions. The circuit court entered a pretrial order dated July 11, 1996, requiring that Dorothy's personal property be mailed to her and that payment of family support commence retroactive to November, 1995, in the sum of $1,500 per month.

[¶ 11.] The trial was held to the court in Parker, South Dakota, and the court issued its opinion in favor of the Guardians. The trial court determined that Dorothy was incompetent, of unsound mind and unable to transact her own financial affairs when the first power of attorney was created and continuously thereafter. Therefore, all powers of attorney were invalid. The court's opinion directed the following: [T]he return of the "Baby Bell" stocks or their equivalent value; the transfer of bank savings account funds to Dorothy; the transfer of the Parker home titled in Oliver's name to Dorothy; an award of a homestead right to Dorothy; allowance of an absolute exemption for certain property owned by Dorothy; an elective share of Oliver's estate for Dorothy; the return of certain other property; and an award of attorney fees for Dorothy against Gleaton, personally. Additional facts will be recited as they become pertinent.

[¶ 12.] Gleaton appeals, contending that the trial court was clearly erroneous or erred as a matter of law in ruling that:

1. Dorothy Perry was incompetent to execute three separate powers of attorney beginning in December, 1992, and that as a result, the transfers of property under those instruments by Oliver Perry were invalid.

2. The bank accounts held in the Farmers State Bank of Parker, South Dakota, were joint accounts.

3. Dorothy Perry has a joint tenancy interest and a homestead right in the Parker residence.

---

3. Mick Turner, the operator of the nursing home in Parker where Dorothy resided and also the

grandson of Oliver, prepared the February 10, 1993, power of attorney.

4. The attorney's fees expended on behalf of Dorothy Perry should be paid by Gleaton.

5. The judgment to return certain stock will be a personal judgment against Gleaton.

## STANDARD OF REVIEW

 [¶ 13.] "This Court reviews a trial court's findings of fact under the 'clearly erroneous' standard and overturns a trial court's conclusions of law only when the trial court erred as a matter of law." *Century 21 Associated Realty v. Hoffman,* 503 N.W.2d 861, 864 (S.D.1993) (citing *Dougherty v. Dougherty,* 482 N.W.2d 320 (S.D.1992); *Jankord v. Jankord,* 368 N.W.2d 571 (S.D.1985)). "The question is not whether this Court would have made the same finding that the trial court did, but whether on the entire evidence we are left with a definite and firm conviction that a mistake has been committed." *Id.* (citations omitted). "We must give 'due regard' to the opportunity of the trial court 'to judge the credibility of the witnesses.'" *Osman v. Keating–Osman,* 521 N.W.2d 655, 657 (S.D.1994) (citation omitted).

## DECISION

### [¶ 14.] 1. Invalidation of Powers of Attorney Based on Incompetence

 [¶ 15.] Neither party disputes the fact that Dorothy is currently incompetent. However, the time when she became incompetent is a matter of dispute. Guardians assert that Dorothy became incompetent to handle her financial affairs in May of 1992. Gleaton claims Dorothy was competent until 1994.

[¶ 16.] The trial court, based on the evidence presented at trial, held that Dorothy was incompetent and of unsound mind at the time she signed the powers of attorney in December, 1992, February, 1993, and May, 1993. Therefore, she was not capable of entering into the agreements under SDCL 53–2–1 [4] and the transfer of property by Oliver under these powers was invalid.

[¶ 17.] However, Gleaton challenges this holding, asserting that there was no persuasive expert testimony presented on the issue of Dorothy's competency. Although Gleaton does not dispute that Dorothy was suffering from the effects of the viral encephalitis and the early stages of Alzheimer's in 1992, she asserts these conditions in and of themselves do not prove incompetency. [Gleaton] argues that the testimony of lay persons offered by the Guardians on the issue of Dorothy's competency was insufficient.

[¶ 18.] However, Gleaton admits the opinion of lay persons can generally be accepted to prove incompetency as long as the lay persons have had sufficient opportunity to observe the person in question. *See Olsen v. Corporation of New Melleray,* 245 Iowa 407, 60 N.W.2d 832, 843 (1953); *In re Hartz's Estate,* 237 Minn. 313, 54 N.W.2d 784, 788 (1952); *In re Scoville's Estate,* 149 Neb. 415, 31 N.W.2d 284, 291 (1948); *see also Caldwell v. John Morrell & Co.,* 489 N.W.2d 353, 362 (S.D.1992) (holding South Dakota's general rule is that "[e]xpert testimony is required when the subject matter at issue does not fall within the common experience and capability of a lay person to judge."). Gleaton's argument thus boils down to essentially a dispute as to whether the lay witness testimony offered by the Guardians was based on sufficient contact with Dorothy.

[¶ 19.] Before addressing the lay witness evidence, we note there was evidence in the form of Dorothy's medical records which were introduced at trial. Dr. Chin wrote in his December 16, 1992, notes that Dorothy was suffering from Alzheimer's type behavior, including sleepiness, confusion, hallucination, and agitation. Dr. Chin's examination took place five days before the first power of attorney was created.

[¶ 20.] Guardians presented evidence to the trial court that Dorothy lacked competency beginning in May of 1992. They observed her and lived with her on a number of occasions between May of 1992 and January of 1993. Guardians and other members of Dor-

---

4. This statute provides in part: "All persons are capable of contracting except ... persons of un- sound mind."

othy's family visited Dorothy around May 20, 1992, when Dorothy suffered from viral encephalitis. Dorothy spent three weeks in the hospital, during which time Guardian Sills visited her and also stayed with Dorothy and Oliver for two weeks after Dorothy's release from the hospital. After Guardian Sills returned to Delaware, Guardian Brown stayed with Dorothy and Oliver. Then in early July, Guardian Sills returned to Texas and stayed with Dorothy and Oliver for another couple of weeks. On October 26, 1992, Dorothy was brought to the home of Guardian Sills in Delaware and lived there until December 6, 1992. Beginning in the summer of 1993, Dorothy's family moved their annual reunion to Parker so Dorothy could attend. In addition, Guardian Sills spoke to Dorothy by telephone at least weekly.

[¶ 21.] The testimony of Mick Turner, Gleaton's witness, also portrayed the confused state of mind that Dorothy suffered from when she moved to South Dakota in February, 1993. Although she could recognize Mick's wife, Dorothy could not remember her room number so her picture was placed on her door so she could recognize what room was hers. Also, Mick testified that Dorothy had short-term memory loss in February of 1993 which only allowed her to remember for time frames of 30 seconds to 5 minutes. Gleaton testified that Dorothy's short-term memory lasted from 5 minutes to an hour.

[¶ 22.] Thus, Gleaton's best evidence was that Dorothy had short periods of lucidity during which she was competent to make decisions about her property. However, the property transfers in question took many months to complete.

[¶ 23.] In the final analysis, the trial court found the testimony of Dorothy's witnesses more persuasive than that of Gleaton's. The trial court could also consider that Mick and Charlene Turner's testimony that Dorothy was competent at the times relevant may have been colored by their self-interest. Mick had received a pickup truck as a gift from Oliver's estate and the Turners both benefitted from Dorothy's placement as a resident in the nursing home which they owned in Parker. "This Court is not free to reweigh the evidence or gauge the credibility of the witnesses." *Miller v. Hernandez*, 520 N.W.2d 266, 272 (S.D.1994) (citing *Darrow v. Schumacher*, 495 N.W.2d 511, 516 (S.D.1993); *Denke v. Mamola*, 437 N.W.2d 205, 207 (S.D. 1989)). The trial court's determination that Dorothy was incompetent was not clearly erroneous given the evidence on both sides of the issue.

**[¶ 24.] 2. Determination that Bank Accounts were Held Jointly**

[¶ 25.] The trial court ruled that the Farmers State Bank "01 account" was a joint account which should be transferred to Dorothy as surviving tenant. The record disclosed that the assets of the account had been pooled from other joint accounts, jointly owned bonds, and joint tenancy property of Oliver and Dorothy which Oliver had transferred under the invalid powers of attorney entirely out of Dorothy's name.

[¶ 26.] Gleaton takes issue with the conclusion that this account was in joint ownership with Dorothy and contends the account did not have Dorothy's name on it, nor was there any evidence that Oliver intended to put the assets into joint ownership when the account was created.

[¶ 27.] It is generally true that, in determining whether property is subject to a joint interest, "[t]he controlling consideration is the intention of the original depositor at the time the accounts were created." *In re Estate of Steed*, 521 N.W.2d 675, 678 (S.D. 1994). "It is not essential . . . that the beneficiary depositor have knowledge of the account; that he have possession of the passbook; that he sign a signature card; or make withdrawals therefrom." *Barbour v. First Citizens Nat'l. Bank of Watertown*, 86 N.W.2d 526, 529, 77 S.D. 106, 113 (S.D.1958), *overruled on other grounds, Wagner v. Wagner*, 163 N.W.2d 339, 342, 83 S.D. 565, 572 (S.D.1968).

[¶ 28.] While the record does not reveal any evidence that Oliver intended to create a joint account when he opened the "01" account, we uphold the trial court's result for a different reason. The trial court found that the money which made up the

"01" account consisted of funds derived by transfers of assets by Oliver out of joint ownership with Dorothy. Since the record supports the finding that Dorothy was incompetent during the time of these transfers, it is appropriate that a constructive or implied trust be employed to secure Dorothy's rights to these funds which were wrongfully taken from her. SDCL 55-1-8 sets out some specific instances where an implied trust arises as follows: "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust or other wrongful act, is, unless he has some other and better right thereto, an implied trustee of the thing gained for the benefit of the person who would otherwise have had it." The code also makes clear that these are not exclusive grounds for the establishment of a constructive trust. SDCL 55-1-11 provides:

> The enumeration in §§ 55-1-7 to 55-1-10, inclusive, of cases wherein an implied trust arises does not exclude or prevent the arising of an implied trust in other cases nor prevent a court of equity from establishing and declaring an implied, resulting, or constructive trust in other cases and instances pursuant to the custom and practice of such courts.

In *Knock v. Knock*, 80 S.D. 159, 120 N.W.2d 572 (S.D.1963), this Court stated that "[a] constructive trust is imposed not because of the intention of the parties, but is a remedial device of equity for the restoration of the status quo." *Id.* at 576. If this trust is not imposed, considering the equities of the situation, Dorothy would be going back to Delaware almost penniless.

[¶ 29.] Were it not for the misuse of the invalid powers of attorney and the transfers that took place while Dorothy was incompetent, Dorothy would have received the value of the funds that made up the "01" account. Although the trial court did not specifically employ a constructive trust, it made the proper decision in light of all the facts. We have consistently held that "[i]f the circuit court reaches the right conclusion for the wrong reason, we will nonetheless affirm." *Horne v. Crozier*, 1997 SD 65, ¶ 5, 565 N.W.2d 50, 52 (citing *Kehn v. Hoeksema*, 524 N.W.2d 879, 881 (S.D.1994); *City of Sioux Falls v. Miller*, 492 N.W.2d 116, 118 (S.D. 1992) (citations omitted)). We affirm the trial court on this issue because equity has been accomplished.

[¶ 30.] **3. Homestead and Joint Tenancy in Residence**

[¶ 31.] The trial court found that Dorothy should be treated as a joint tenant of the home in Parker. Although Oliver purchased the home in his name only, the court found the Parker home was purchased with funds from the sale of the family home in Texas. The couple's home in Texas was sold utilizing the third power of attorney that the court found was invalid. Tracing the funds from the sale of the Texas home to the purchase of the Parker home, the trial court determined that Dorothy continued to be a joint owner of the home.

[¶ 32.] Gleaton takes issue with both the conclusion that Dorothy was a joint owner of the Parker home and the trial court's allowance of a homestead exemption to Dorothy.

[¶ 33.] Since we have already concluded there was no error in the trial court's determination that the powers of attorney were invalid, the house in Texas was obviously sold without proper authority. Therefore, it is appropriate that an implied trust arise in Dorothy's favor over the Parker home. SDCL 55-1-8. Furthermore, the use of an invalid power of attorney to sell the Texas homestead of Dorothy, cannot, in equity, be used to prevent her from acquiring a homestead interest in the home purchased with the proceeds from that wrongful sale. The trial court restored Dorothy's rightful interest under the circumstances and we find no error in the trial court's action.

[¶ 34.] **4. Award of Attorney's Fees**

[¶ 35.] The trial court decided the attorney fees expended by Dorothy's guardians should be paid by Gleaton. The circuit court explained that the attorney fees were awarded because the "probate estate benefitted by Guardians pursuing Dorothy's assets and that the action on the part of the Guardians was brought because of the bad faith, mismanagement and other actions of [Gleaton]." Gleaton contests this award.

[¶ 36.] SDCL 15–17–38 gives the trial court the authority to grant attorney fees in probate and guardianship proceedings. The test is well-established that "[a] beneficiary of an estate is entitled to an allowance for attorney fees where the attorney's services have been beneficial to the estate and were necessary because of the executor's negligence, fraud or inactivity." *O'Brien v. Gridley,* 458 N.W.2d 802, 807 (S.D.1990) (citing *In re Estate of Bamberger,* 79 S.D. 85, 108 N.W.2d 50 (1961)).

[¶ 37.] Although this is a close case, we conclude there is no authority for the award of attorney fees under the circumstances. Even though this action was brought in the confines of a probate proceeding, it was not maintained for the benefit of the estate. In reality, Dorothy's attorney expenses were incurred securing Dorothy's property, not property of Oliver's estate. Furthermore, the actions of Gleaton which sparked the trial court's award were mainly carried out before she assumed the duties of personal representative. After being appointed, Gleaton may have delayed the administration of some estate duties, but her failings in that respect do not meet the test for attorney fees to be awarded. We reverse the trial court's award of attorney fees.

[¶ 38.] **5. Return of Stock as Personal Judgment**

[¶ 39.] Gleaton contended at trial that she paid $17,000 in cash to Dorothy in return for stock with a market value of $40,-000. The trial court found there was no evidence that Gleaton had ever paid any money for the stock. Furthermore, the trial court found the transfer by Oliver of this stock was void and invalid anyway, because the power of attorney which he used to effectuate the transfer was ineffective due to Dorothy's incompetence.

[¶ 40.] To support the transfer of stock, Gleaton reiterates her argument concerning the competency of Dorothy to grant the powers of attorney—an argument which we have already rejected. Gleaton also challenges the jurisdiction of this Court to enter an order with respect to the ownership of the stock. However, she cites no supporting authority. "Failure to cite supporting authority is a violation of SDCL 15–26A–60(6) and therefore, this issue is deemed waived." *West Two Rivers Ranch v. Pennington Cty.,* 1996 SD 70, ¶ 13, 549 N.W.2d 683, 687 (citing *Cooper v. Hauschild,* 527 N.W.2d 908, 912 (S.D.1995); *Kostel Funeral Home, Inc. v. Duke Tufty Co.,* 393 N.W.2d 449, 452 (S.D. 1986)).

[¶ 41.] We have considered the remaining issues and find them to be without merit.

[¶ 42.] The trial court is affirmed in part and reversed in part.

[¶ 43.] MILLER, C.J., and SABERS, KONENKAMP, and GILBERTSON, JJ., concur.